UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN HENRY McMURRY,

                Plaintiff,                                 Hon. Gordon J. Quist

v.                                                    Case No. 1:10 CV 1206

PATRICIA CARUSO, et al.,

                Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>Defendants' Motion for Summary Judgment</u>, (dkt. #30), and <u>Defendant Gardon's Motion for Summary Judgment</u>, (dkt. #61). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motions each be **granted in part and denied in part** as detailed herein.


## BACKGROUND

Plaintiff John Henry McMurry presently is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Ryan Correctional Facility (RRF). The actions about which he complains, however, occurred between December 2006 and December 2010 at the Bellamy Creek Correctional Facility (IBC), the Riverside Correctional Facility (RCF), the Muskegon Correctional Facility (MCF), the G. Robert Cotton Correctional Facility (JCF), the Earnest C. Brooks Correctional Facility (LRF) and Lakeland Correctional Facility (LCF). Plaintiff sues the following Defendants: MDOC Director Patricia Caruso; JCF Doctors Vernon Stevenson, Savi Thri Kakani, Zivti Cohen, and Mehdi Almasi, Health Unit Manager Beth Gardon, Dietician Mary J. Eicher, and Resident Unit Officers

(unknown) Pull, (unknown) Baker, and (unknown) Samulak; LCF Doctors Bhamini Sudhir, Richard Hirschler and Syed Sohail, Dietician Patricia Willard and Assistant Food Service Director Debbie Lawrence; MCF Nurses Mike Whalen and Mary Hubbell; and Prison Healthcare Services, Inc. (PHS).

Plaintiff's amended complaint consists of sweeping allegations that Defendants conspired over a period of nearly four years to deny him adequate medical care for his various medical conditions. Plaintiff sets forth seven purported causes of action, in which he broadly alleges that Defendants' conduct violated the Eighth Amendment and the Americans with Disabilities Act (ADA), as well as state statutes, MDOC policies and procedures, and the state's contractual agreement with PHS. Plaintiff seeks declaratory relief, monetary damages, and injunctive relief in the form of specific medical treatment. While Plaintiff's amended complaint contains no specific factual allegations, he has submitted with his amended complaint a "Sworn Statement of the Factual Basis of the Complaint" in which Plaintiff makes the following allegations. (Dkt. #13, Exhibit 2).

Plaintiff had reconstructive right-knee surgery on June 30, 2006, while in the custody of the MDOC at Macomb Correctional Facility. He was placed in a cast until August 24, 2006, and after the cast was removed, he could not bend his knee at all. He received physical therapy from October to December 2006, which improved his knee flexion to sixty percent. On December 7, 2006, Plaintiff's physician recommended that he: (1) use an exercise bike daily; (2) take Motrin; (3) have a lower-bunk assignment; and (4) be given soft-toe shoes with arch support.

On December 18, 2006, Plaintiff was transferred to IBC, which had no exercise bike. Plaintiff met with Nurse Valorie K. Hammond, who told Plaintiff that the facility was not required to honor his doctor's recommendations. Plaintiff asked for a transfer to a facility that could meet his rehabilitation and accommodation needs. Although Hammond declined to recommend the transfer,

Plaintiff was transferred to RCF on January 11, 2007.  Plaintiff had no access to an exercise bike at RCF, but he was given a bottom-bunk assignment.

Plaintiff was transferred to MCF on March 14, 2007.  At MCF, he was assigned to a top bunk.  Plaintiff told Nurse Todd Hix that he could not climb to the top bunk.  Hix told Plaintiff that he could not make a bottom-bunk assignment and that Plaintiff needed to kite Defendant Mike Whalen about the issue.  Plaintiff immediately completed an emergency request to Whalen and slept in his chair that night.  The following day, Plaintiff was required by staff to climb into his bunk during prisoner count, upon penalty of receiving a misconduct ticket.  Plaintiff attempted to climb to the top bunk, which had no ladder.  Plaintiff climbed a chair and attempted to step onto the desk, but his knee did not bend, causing him to fall.  Plaintiff reported the fall to custody staff, who again told him to kite healthcare. The following day, March 16, 2007, Plaintiff addressed a kite to Defendant Whalen and Doctor Jason Kim.  Defendant Whalen responded on March 28, 2007, though Plaintiff did not receive the response until April 15, 2007.  In the interim, Plaintiff also complained to Warden Shirlee Harry and Todd Hix, both of whom told him to address his concerns to Defendant Whalen.   Whalen determined that Plaintiff's complaints were not urgent.

On four occasions between April 17, 2007, and May 7, 2007, Plaintiff sent additional kites to Defendant Whalen and Dr. Kim complaining about pain and his need for soft-toed shoes.  On April 24, 2007, Plaintiff sent a similar kite to Defendant Mary Hubbell who responded that soft-toed shoes were not approved by the Regional Medical Officer.

On May 11, 2007, Plaintiff was examined by Nurse Clarice Kanouse who issued Plaintiff a temporary bottom-bunk detail valid until June 11, 2007.  Over the course of the next three months, Plaintiff sent Defendant Whalen numerous complaints of lower back, hip and shoulder pain.  Plaintiff

was eventually scheduled to visit with a doctor in August. Plaintiff's temporary bottom-bunk detail was later extended, but he was nonetheless moved to a cell on the second floor. On September 11, 2007, Plaintiff was examined by Dr. Suzanne Hawkins who ordered that Plaintiff be sent to Brooks Correctional Facility for an x-ray. Dr. Hawkins again examined Plaintiff on September 28, 2007, but the previously ordered x-rays were not available. The doctor also requested that Plaintiff participate in an MRI examination. Dr. Hawkins told Plaintiff that another follow-up examination would be scheduled, but no such examination ever occurred.

Plaintiff filed numerous additional grievances about his back, hip and knee pain between October 10, 2007 and February 18, 2008. He also sent complaints about pain, unexpected bladder and bowel incontinence, and his various medications between March and May 2008. On May 27, 2008, Plaintiff complained to health care that he was experiencing burning in the back of his throat, that swallowing food was painful, and that he was also suffering wheezing and shortness of breath. Plaintiff was examined on June 23, 2008, by Physician's Assistant Daniel Spitters and Nurse Rosa Rodriguez. Spitters diagnosed GERD-reflux, for which he prescribed Gaviscon and Zantac. Spitters, however, refused to address Plaintiff's back complaints.

Between July and October 2008, Plaintiff filed various healthcare requests concerning his pain and incontinence. He was examined by Dr. Thornton on October 7, 2008, but the doctor refused to address anything other than Plaintiff's asthma. On October 20, 2008, and November 5, 2008, Plaintiff filed additional kites about his pain and his bowel and bladder control issues. Plaintiff was examined by Nurse Rodriguez on December 9, 2008, who referred Plaintiff to a doctor. Plaintiff did not receive a medical call-out within three weeks, however, at which point Plaintiff filed another kite. On January 5, 2009, Plaintiff was examined by Dr. Ronald Graeser who determined that an MRI was necessary.

On February 2, 2009, Plaintiff participated in an MRI examination, the results of which revealed that he had a herniated disc. Plaintiff was then scheduled for an evaluation with a neurosurgeon. On February 6, 2009, Plaintiff sent a kite complaining about pain and lack of bladder control. He received a response on March 3, 2009, advising him to take Naproxen and hot showers for his pain. On March 20, 2009, Plaintiff was transported to Duane Waters Hospital for a consultation with neurosurgeon Dr. Harish Rawal. Plaintiff alleges that no medical records were sent with him, so Dr. Rawal was unable to review the MRI necessary to conduct a complete evaluation. Plaintiff alleges that the failure to send medical records was an act of retaliation by unnamed Defendants.

Following his consultation with Dr. Rawal, Plaintiff submitted multiple kites about pain between March 24, 2009, and April 1, 2009. Plaintiff was subsequently examined by a physician's assistant, at which point he asserted that Naproxen was not helping his back, hip or shoulder pain. No new medication was prescribed, however. Plaintiff again kited health services on April 23, 2009, describing his pain and his need for a lower bunk. Plaintiff was informed that his chart was sent to the medical service provider for review. Plaintiff sent a kite to Whalen and Hubbell on April 25, 2009, complaining about his lack of bladder control. On April 27, 2009, Nurse Kanouse responded to the kite, informing Plaintiff that his chart would be given to a physician's assistant. On May 6, 2009, Plaintiff again requested a bottom-bunk detail and sought referral to the pain management team because of his unbearable pain and daily loss of bladder control.

On May 14, 2009, Plaintiff was transferred to JCF so that he would have access to Duane Waters Hospital for the physical therapy recommended by Dr. Rawal. At the time of his transfer, Plaintiff had an accommodation for a ground floor cell and a lower bunk. Nevertheless, Plaintiff was placed on the upper floor and harassed by custody staff about his accommodations. Plaintiff was later

informed that the accommodation he sought required the approval of Defendant Gardon. On May 18, 2009, Plaintiff submitted a kite to Defendant Gardon concerning his request for an accommodation. Gardon did not respond to Plaintiff's kite. On May 24, 2009, Plaintiff submitted another kite to Gardon concerning his request for an accommodation. Defendant Gardon again failed to respond to Plaintiff's kite. Plaintiff also spoke with Resident Unit Advisor O'Dell, showing him his cell and bunk accommodations. O'Dell said he would contact Assistant Deputy Warden Larry Ford to approve the move. The move was approved and Plaintiff was moved to a bottom bunk in a ground-floor cell.

On June 3, 2009, Plaintiff was moved to the top bunk of an upstairs cell, "under threat, intimidation, [and] duress by custody staff." When Plaintiff objected to the move, Defendant Pull told Plaintiff that if he did not comply he would be sent to segregation. Plaintiff told Pull that the move violated MDOC policy directives. Plaintiff showed his accommodations to Defendants Pull, Kisor and Samulak, who responded that such were not valid at JCF. In order to avoid a misconduct ticket, Plaintiff attempted to climb into his bunk. Plaintiff's back and knee gave out and he fell to the floor. He was lying on the floor in his own urine and asked his cell-mate to call for medical treatment. Defendants Pull, Baker, Samulak and Kisor believed Plaintiff was faking an injury in order to get a bottom bunk. Plaintiff told Defendants that he could not get up, and they indicated that he could either get up or sleep on the floor. Defendants departed and did not check on Plaintiff again that night. Plaintiff remained on the floor all night. The following morning, Plaintiff asked his cell-mate to help him up after which he asked prison staff to contact health care. Plaintiff was instructed to send a kite. On June 4, 2009, Plaintiff sent a kite explaining his fall and the refusal of staff to call for medical treatment.

On June 12, 2009, Plaintiff was examined by a physical therapist. Between June 4, 2009, and July 28, 2009, Plaintiff sent several kites complaining about his reflux symptoms and breathing

problems.  He received an unspecified response on July 10, 2009, and was examined by Defendant

Physician's Assistant Savi Thri Kakani on July 17, 2009.  Plaintiff requested new pain medication,

described his GERD problems, reported his fall, and described blood in his urine and urinary and bowel

incontinence.  Kakani refused to authorize additional treatment or a special diet, indicating that Plaintiff

looked healthy to her.  Plaintiff met with Defendant JCF Dietician Eicher on August 4, 2009.  Eicher

reported that Plaintiff was overweight at 237 pounds and had gained 30 pounds since his back injury.

Plaintiff alleges that Eicher's data entries were knowingly false, in violation of both state and federal

law.  Plaintiff met with Nurse Mary Wilson on August 5, 2009, concerning his complaints of

incontinence and back pain, but Wilson did not examine Plaintiff.

On August 21, 2009, Plaintiff was examined by Dr. Vernon Stephenson.  Plaintiff gave

Stephenson a document entitled "Legal Constructive Notice," setting forth his claims of GERD,

unexpected urination, blood in his stool, burning in the back of his throat, chest/abdominal pain,

vomiting, dizziness, wheezing, and shortness of breath.  Stephenson prescribed an anti-depressant

medication for pain and canceled the request for physical therapy because Plaintiff had issues of

unexpected urination.  Plaintiff's symptoms subsequently worsened and he submitted additional medical

kites on numerous occasions between August 24, 2009, and October 12, 2009.  When Plaintiff was

examined by Defendant Dr. Zivit Cohen on October 21, 2009, he gave the doctor a "Legal Constructive

Notice" regarding his symptoms.  Dr. Cohen refused additional treatment for Plaintiff's GERD and

refused to prescribe a special diet for Plaintiff.

Plaintiff submitted another kite on November 10, 2009, complaining about his various

ailments.  On November 13, 2009, Plaintiff met with Nurse Frances Hinsley, who was unable to answer

questions about his problems.  Plaintiff was told by Mary Wilson that Health Unit Manager Gardon

refused to approve his request for a bottom bunk because he was young enough to climb into an upper bunk. Plaintiff kited Gardon on December 6, 2009, but she never responded.

On December 8, 2009, Plaintiff met with Defendant Dr. Mehdi Almasi about the blood in his urine, incontinence, GERD and pain. Plaintiff also provided Dr. Almasi with a "Legal Constructive Notice." Almasi prescribed ten days of pain medication and also advised Plaintiff that he did not have the results of an ultrasound test Plaintiff had been given. On December 23, 2009, Plaintiff complained to Dr. Tomsen that he was unstable because he was being laughed at and was humiliated about his incontinence issues. That same day, Plaintiff met with Dr. Almasi, who advised Plaintiff that the results of his ultrasound test were normal.

Plaintiff complained again on December 29, 2009 and January 11, 2010, adding to his list of problems swelling in his right knee and numbness in his right hand and toes. On February 4, 2010, Plaintiff was taken to the hospital for diagnostic testing in the form of an intravenous pyelogram of his bladder and kidneys due to his complaints of blood in the urine, painful urination, vomiting, nausea and hypertension. On February 24, 2010, Dr. Cohen met with Plaintiff regarding his complaints of blood in his urine, hypertension and chronic back pain. Plaintiff told the doctor that Tylenol was not helping with his pain. Sometime thereafter, Plaintiff was called to health services to provide a supervised urine specimen the results of which were totally clear. According to Plaintiff, his urine sample was clear because he had consumed a large quantity of water that morning. On January 28, 2010, Dr. Cohen issued Plaintiff a reflux-diet accommodation which was scheduled to continue until July 29, 2010.[1]

---

[1] Although Plaintiff states that Dr. Cohen issued the accommodation on January 28, 2009, this appears to be a typographical error, as Plaintiff was not housed at JCF or treated by Defendant Cohen in January 2009.

On March 11, 2010, Plaintiff was transferred to the Carson City Correctional Facility (DRF) supposedly in retaliation for his many complaints. Plaintiff's still-valid reflux diet detail could not be accommodated at DRF. Plaintiff was examined by Physician's Assistant George about his GERD. When presented with Plaintiff's "Legal Constructive Notice," George refused to address any other health issue. Plaintiff was transferred to the Lakeland Correctional Facility (LCF) on May 26, 2010.

On June 28, 2010, Defendant Dr. Bhamini Sudhir examined Plaintiff regarding his complaints of blood in his urine, burning while urinating, incontinence, his need for incontinence pads, his need for pain medication, and his request for physical therapy. Dr. Sudhir refused to treat Plaintiff, telling him that the state was broke and that Plaintiff needed to purchase over-the-counter medication. The doctor also told Plaintiff that his reflux diet was being discontinued because the new standard menu would meet his needs. While the doctor agreed that certain food items caused Plaintiff problems, she told Plaintiff that suffering was good because it built character. Dr. Sudhir did, however, submit a request for physical therapy. Dr. Hirschler was present during this particular appointment.

On July 28, 2010, Plaintiff met with Dr. Hirschler and presented him with another "Legal Constructive Notice." Dr. Hirschler told Plaintiff that his condition was not life threatening and that the company (PHS) was in place to save the State of Michigan money. On June 28, 2010, Plaintiff met with Dr. Syed M. Sohail to whom he also provided a "Legal Constructive Notice." Dr. Sohail told Plaintiff that PHS had denied the request for physical therapy. The doctor instead provided Plaintiff a sheet containing exercises that he could complete on his own. Dr. Sohail denied Plaintiff's request for additional pain medications and instead told him to buy over-the-counter medications. Dr. Sohail also denied Plaintiff treatment for any other problem.

On August 17, 2010, Plaintiff received an answer from Dr. Sohail concerning one of the assertions in the "Legal Constructive Notice." The doctor further instructed Plaintiff to submit a kite to obtain an appointment to address additional issues. Plaintiff submitted multiple kites and on October 20, 2010, he was called out to health care. Plaintiff met with Nurse Practitioner Raymond Ingraham to whom he presented a "Legal Constructive Notice." Plaintiff alleges that Ingraham was rude and refused to address the issues in the Notice.

Plaintiff kited Defendant Dietician Patricia Willard on July 7, 2010. Plaintiff complained that his diet was "not accurate" and that he was being served foods which "hurt" him. On July 13, 2010, Plaintiff was served beef stew from the main food menu. The stew contained tomatoes, which caused Plaintiff to experience reflux problems. Plaintiff showed the stew to Food Service Supervisor E. Smith who told Plaintiff to kite Defendant Willard. Soon thereafter, Plaintiff was again served beef stew which caused him to vomit on his tray. Plaintiff took his tray to Defendant Debbie Lawrence, who told him that Willard had authorized the stew to be served to Plaintiff. According to Plaintiff, Defendants Willard and Lawrence conspired to cause Plaintiff pain. On July 25, 2010, Willard recommended that Plaintiff's diet detail be renewed for three months, until October 28, 2010.

On October 21, 2010, Plaintiff was transferred to the Earnest C. Brooks Correctional Facility (LRF) in order to participate in the Legal Writing Program. At intake, Nurse Holly Smyth supplied Plaintiff with his reflux-diet detail. Plaintiff showed his detail to the food services staff who made a copy thereof. After receiving his special diet the following day, Plaintiff was informed by a cook that he had been instructed by Assistant Food Service Director Daniels to no longer serve Plaintiff a special diet because Plaintiff's diet detail was invalid. Plaintiff was denied his special diet between October 24, 2010 and December 16, 2010. In response to Plaintiff's kites, Dietician Barbara Anderson

told Plaintiff that his diet detail had expired and would not be renewed because he could eat from the regular menu.  Plaintiff alleges that Defendant Dieticians Eicher and Willard fail to satisfy the qualifications for dietician articulated by Michigan law.

On March 23, 2011, the Honorable Gordon J. Quist issued an Opinion and Order dismissing the majority of Plaintiff's claims.  (Dkt. #16-17).  Specifically, Plaintiff's claims have all been dismissed except for his Eighth Amendment claims against Defendants Stevenson, Kakani, Pull, Baker, Samulak, Cohen, Almasi, Sudhir, Hirschler, Sohail, Whalen, Gardon, and Prison Health Services. Defendants Pull, Samulak, and Gardon now move for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by

admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*,

270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

I.      **Defendant Gardon**

A.      Eighth Amendment Claims

As previously noted, in his verified amended complaint Plaintiff makes the following allegations regarding Defendant Gardon. When Plaintiff transferred to JCF on May 14, 2009, he had a valid accommodation to be housed on the ground floor in a bottom bunk. JCF personnel, however, refused to honor this accommodation. Plaintiff was informed that such an accommodation would have to be approved by Defendant Gardon. On May 18, 2009, Plaintiff submitted a kite to Defendant Gardon concerning his request for an accommodation. Gardon failed to respond to Plaintiff's request. On May

24, 2009, Plaintiff submitted another kite to Gardon concerning his request for an accommodation. Gardon again failed to respond to Plaintiff's request.  On or about November 13, 2009, Plaintiff was informed by Mary Wilson that Gardon refused to approve his request for a bottom bunk accommodation. Plaintiff submitted another kite to Defendant Gardon concerning his request for an accommodation on December 6, 2009.  Gardon failed to respond to Plaintiff's request.  In sum, Plaintiff alleges that on three separate occasions, Defendant Gardon disregarded his request for an accommodation necessitated by his medical condition thereby violating his Eighth Amendment rights.

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976).  Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs."  *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001).  The analysis by which a defendant's conduct is evaluated consists of two-steps.  First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious.  A "serious medical need," sufficient to implicate the Eighth Amendment, is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  If the objective test is met, the Court must then determine whether the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it." *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847).

To the extent, however, that the plaintiff simply disagrees with the treatment he received, or asserts that he received negligent care, the defendant is entitled to summary judgment. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) (to prevail on an Eighth Amendment denial of medical treatment claim, "the inmate must show more than negligence or the misdiagnosis of an ailment"); *Robbins v. Black*, 351 Fed. Appx. 58, 62 (6th Cir., Nov. 3, 2009) ("mere negligence or malpractice is insufficient to establish an Eighth Amendment violation").

Defendant Gardon does not challenge whether Plaintiff was experiencing a serious medical need. Gardon does not dispute that Plaintiff asked her to approve the requested accommodation. Likewise, Gardon does not allege that she responded to Plaintiff's requests and that her responses were reasonable under the circumstances. Instead, Gardon asserts that "due to her lack of involvement in Plaintiff's direct medical care," Plaintiff is seeking to hold her liable pursuant to a respondeat superior theory. In support of her motion, Defendant has submitted an affidavit in which she

asserts, "I did not provide any direct clinical care to the Plaintiff." (Dkt. #62, Exhibit A). Gardon further asserts, "I have no specific recollection of the alleged complaints described by the Plaintiff." *Id.*

The Court is unpersuaded by Defendant's argument. First, the fact that Gardon may exercise some measure of supervisory authority does not necessarily lead to the conclusion that Plaintiff is seeking to vicariously hold her responsible for the actions of others. In his verified complaint, Plaintiff alleges that he was specifically instructed to ask Gardon for approval of his requested accommodation. Plaintiff alleges that he did, in fact, ask Gardon to approve his accommodation request, but that she initially failed to act and then eventually denied his accommodation. The only evidence Defendant Gardon has submitted is an affidavit in which she concedes she did nothing. This evidence, if anything, supports Plaintiff's position. Defendant Gardon has failed to demonstrate that there does not exist a genuine factual dispute as to Plaintiff's claims against her. Accordingly, the undersigned recommends that Defendant Gardon's motion for summary judgment be denied.


B.      Qualified Immunity

Defendant Gardon asserts that she is entitled to qualified immunity because she "acted reasonably at all times" and did not violate Plaintiff's constitutional rights.

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of harassing litigation. *See Davis v. Scherer*, 468 U.S. 183, 195 (1984). As is well recognized, they can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages, and if unjustified lawsuits are quickly terminated. *Id.* Generally, when government officials perform discretionary functions, they are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also, Behrens v. Pelletier*, 516 U.S. 299, 301 (1996). The question whether a defendant enjoys qualified immunity is a question of law for the Court to resolve. *See Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001).

When evaluating claims of qualified immunity, the Court employs a two-step analysis. The Court first determines "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If such fail to establish a violation of the plaintiff's constitutional rights, the defendant is entitled to immunity. *See Callahan*, 129 S.Ct. at 816. On the other hand, if the facts establish a violation of the plaintiff's constitutional rights, the Court must then determine whether the right in question was "clearly established" at the time the defendant acted. The defendant is entitled to qualified immunity unless his "conduct violated a clearly established constitutional right." *Id.* The inquiry whether a particular right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) (citing *Saucier*, 533 U.S. at 201). The contours of the right in question "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Fisher v. Harden*, 398 F.3d 837, 845 (6th Cir. 2005) (quoting *Saucier*, 533 U.S. at 202). The focus of this inquiry is "on whether the officer had fair notice that her conduct was unlawful." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005).

Where neither the motion for qualified immunity nor the opposition thereto is supported by evidence, the first step of the qualified immunity analysis focuses on the allegations in the plaintiff's

complaint and whether such state a claim for violation of the plaintiff's constitutional rights.  If, on the other hand, the motion for qualified immunity and/or the opposition thereto are supported by evidence, such must be considered pursuant to the summary judgment standard articulated above.  Thus, if the evidence submitted by the parties demonstrates the existence of a genuine factual dispute, the resolution of which is essential to determining whether the defendant violated the plaintiff's constitutional rights, qualified immunity is not warranted.  However, if the evidence establishes that the defendant did not violate the plaintiff's constitutional rights, qualified immunity is appropriate.  *See, e.g., Scott v. Harris*, 550 U.S. 372, 377-86 (2007) (officer entitled to qualified immunity where evidence was such that "no reasonable jury" could have concluded that officer violated the plaintiff's constitutional rights).  Likewise, if the right in question was not "clearly established" at the time the defendant acted, the defendant is entitled to qualified immunity.

Generally, to find a clearly established constitutional right, the district court "must find binding precedent by the Supreme Court, its Court of Appeals or itself."  *Fisher*, 398 F.3d at 845 (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988)).  In extraordinary circumstances, however, the decisions of other courts may suffice if such decisions "both point unmistakably to the unconstitutionality of the conduct complained of and are so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting."  *Fisher*, 398 F.3d at 845-46 (quoting *Seiter*, 858 F.2d at 1177).  A single idiosyncratic opinion from another circuit's court of appeals, however, is insufficient to put a defendant on notice of how the Sixth Circuit might decide the issue in question.  *See Davis v. Holley*, 835 F.2d 1175, 1182 (6th Cir. 1987).

In determining whether a defendant is entitled to qualified immunity, the focus is on the objective legal reasonableness of his actions in light of clearly established law as it existed when he engaged in the challenged conduct. *See Anderson*, 483 U.S. at 640; *Harlow*, 457 U.S. at 818; *Fisher*, 398 F.3d at 845. Accordingly, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Fisher*, 398 F.3d at 845 (quoting *Saucier*, 533 U.S. at 202).

Finally, while it "is often appropriate" to evaluate qualified immunity claims by analyzing the two analytical steps in sequence, such is no longer mandated. *See Callahan*, 129 S.Ct. at 818. As the *Callahan* Court stated, "[t]he judges of the district courts. . .should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

As discussed above, the existence of unresolved factual issues preclude granting Defendant Gardon's motion for summary judgment. Moreover, a reasonable prison official would have understood that refusing Plaintiff's request for a reasonable and medically necessary accommodation violated the Eighth Amendment. The undersigned, therefore, recommends that Defendant Gardon's motion for qualified immunity be denied.

C.      Eleventh Amendment Immunity

In his amended complaint, Plaintiff states that he is suing Defendant Gardon in her personal and official capacities.  Plaintiff seeks declaratory, injunctive, and monetary relief.  Defendant Gardon asserts that she is entitled to immunity under the Eleventh Amendment as to those claims asserted against her in her official capacity.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend XI.  This provision has long been interpreted as precluding "federal jurisdiction over suits against nonconsenting States."  *Kimel v. Florida Board of Regents*, 528 U.S. 62, 72-73 (2000).  Accordingly, the Eleventh Amendment generally precludes federal court actions against a State unless that state has waived its sovereign immunity or consented to suit in federal court.  *See Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989)).  The Court notes that the State of Michigan "has not consented to being sued in civil rights actions in the federal courts."  *Johnson v. Unknown Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004).  An action asserted against a State official in his official capacity is considered an action against the State.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

An exception to this general rule exists, however, for claims seeking prospective injunctive or declaratory (non-monetary) relief compelling a state official (in his official capacity) to comply with federal law.  *See Ex Parte Young*, 209 U.S. 123 (1908); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507-08 (6th Cir. 2008) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

The Court finds that Defendant is entitled to immunity as to Plaintiff's claims for monetary damages against her in her official capacity. Accordingly, the Court recommends that Plaintiff's claims for monetary damages asserted against Defendant Gardon in her official capacity be dismissed.

**II.         Defendants Pull and Samulak**

A.         Eighth Amendment Claims

Plaintiff's claims against Defendants Pull and Samulak concern an incident that allegedly occurred on June 3, 2009. In his verified amended complaint, Plaintiff alleges that on this date he was instructed to move to the top bunk of an upstairs cell. Plaintiff objected to this instruction on the ground that it was contrary to a medical accommodation he was recently issued. In response to Defendants' motion, Plaintiff has submitted a copy of this medical detail. (Dkt. #56, Exhibit D at 7). This evidence reveals that on April 28, 2009, Physician's Assistant Thomas LaNore instructed that Plaintiff be housed in a "bottom bunk" from April 28, 2009, through July 28, 2009, due to "chronic lumbago."

In his verified amended complaint, Plaintiff asserts that when he showed evidence of this accommodation to Defendants Pull and Samulak, both told Plaintiff that his accommodation was not valid because it was issued at a different facility. In order to avoid a misconduct ticket, Plaintiff attempted to climb into his new bunk, but he was unable to do so and he fell to the floor. Plaintiff was lying on the floor in his own urine and asked his cell-mate to call for medical treatment. Defendants Pull and Samulak believed that Plaintiff was faking an injury in order to get a bottom bunk. When Plaintiff told Defendants that he was unable to get up off the floor, Pull and Samulak told Plaintiff that he could either get up on his own or sleep on the floor. Defendants Pull and Samulak then departed and

did not check on Plaintiff again that night.  Unable to get up off the floor, Plaintiff remained on the floor all night.

The Court interprets Plaintiff's amended complaint as asserting two distinct claims against Defendants Pull and Samulak.  First, Plaintiff asserts that the refusal by Defendants to respect and comply with his bottom bunk accommodation violated his Eighth Amendment rights.  Second, Plaintiff asserts that the failure by Defendants Pull and Samulak to do anything when asked to help him get up off the floor likewise violated his Eighth Amendment rights.

### 1.       Bottom Bunk Accommodation

As discussed above, Plaintiff has submitted evidence that as of June 3, 2009, he had a valid medical detail, issued by a medical professional, that he be housed in a bottom bunk.  According to Plaintiff, Defendants Pull and Samulak nevertheless directed Plaintiff to transfer to another cell and sleep in an upper bunk.  Defendants allegedly ignored Plaintiff's accommodation on the ground that it was not valid because it was issued at a different facility.  Defendants assert that they are entitled to summary judgment on the ground that they "had nothing to do with the cell transfer decision" and were instead required to simply "effectuate that move based on the orders and information that they are given."  Defendants also argue that as of June 3, 2009, Plaintiff neither had nor required a bottom bunk accommodation.

In support of their motion for summary judgment, Defendants Pull and Samulak rely on several items of evidence.  Specifically, Defendants have each submitted affidavits.  Defendants are also relying on portions of Plaintiff's medical record as well as responses to prison grievances submitted by Plaintiff.  As is well recognized, "only admissible evidence may be considered by the trial court in ruling

on a motion for summary judgment." *Rogers v. Lilly*, 292 Fed. Appx. 423, 428 n.3 (6th Cir., Aug. 22, 2008) (quoting *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001)).  The prison grievances on which Defendants rely constitute hearsay, however, and Defendants offer no argument that these documents are admissible pursuant to an exception to the rule against hearsay.  Accordingly, the Court has disregarded this "evidence."  Consideration of the other evidence submitted by Defendants fails to persuade the Court that summary judgment is appropriate.

Defendants have submitted selected portions of Plaintiff's medical record to support their position that Plaintiff neither had a valid bottom bunk detail on the date in question nor required such an accommodation.  (Dkt. #33).  This Court is unpersuaded.  First, as previously noted, Plaintiff has submitted a copy of a medical detail issued on April 28, 2009, by Physician's Assistant LaNore that provides that Plaintiff is to be housed in a bottom bunk from April 28, 2009, through July 28, 2009.  As previously noted, Plaintiff asserts that he showed this detail to Defendants Pull and Samulak.

Second, as Defendants concede, Plaintiff was issued a bottom bunk accommodation the following day by JCF medical personnel.  The fact that Plaintiff was issued a bottom bunk accommodation on June 4, 2009, tends to contradict Defendants' argument that as of June 3, 2009, Plaintiff's medical condition did not necessitate a bottom bunk accommodation.  Finally, even if the Court assumes the accuracy or reasonableness of Defendants' interpretation of Plaintiff's medical records, there is no evidence that as of the date of the incident in question Defendants had reviewed or were otherwise aware of the contents of Plaintiff's medical records or were otherwise knowledgeable about Plaintiff's medical condition.

In addition to these medical records, Defendants Pull and Samulak have each submitted affidavits in which they each assert that they "have no authority over cell/bunk assignments and have

no authority to approve a cell move" as such decisions originate with the "JCF Control Center." (Dkt. #31, Exhibits D-E). While these particular assertions are uncontested, the Court finds them to be only marginally relevant. The issue is not whether Defendants Pull and Samulak made the decision to move Plaintiff to an upper bunk, but whether Defendants were deliberately indifferent to a serious medical need Plaintiff was experiencing.

The fact that as of the date in question Plaintiff had a bottom bunk accommodation (as well as the fact that Plaintiff was issued another such accommodation the following day) presents a factual dispute as to whether Plaintiff was experiencing a serious medical condition. With respect to the subjective element of the analysis, Plaintiff asserts that he showed Defendants the medical detail issued to him on April 28, 2009. Plaintiff further asserts that Defendants Pull and Samulak completely disregarded this medical detail, informing Plaintiff that such was invalid because it was issued at a different facility. Defendants Pull and Samulak do not dispute Plaintiff's assertion that they were presented with the medical detail and that they disregarded it. Thus, the evidence thus far submitted, viewed in a light most favorable to Plaintiff, indicates that Defendants Pull and Samulak knowingly disregarded the instructions issued by a medical professional that Plaintiff not be housed in an upper bunk. The intentional disregard of the instructions of a medical professional caring for a prisoner is the epitome of deliberate indifference. The undersigned, therefore, recommends that Defendants' motion for summary judgment be denied as to this particular claim.[2]

---

[2] The Court would perhaps view this matter differently if there was evidence that Defendants, after being informed by Plaintiff of his medical detail, took action which was reasonable under the circumstances or if there was evidence that there existed a legitimate reason to assign Plaintiff to an upper bunk.

2.     Failure to Assist

Plaintiff alleges that after Defendants Pull and Samulak made the decision to disregard his bottom bunk accommodation, he attempted to climb into his new bunk.  Plaintiff was unable to do so and fell to the floor and lay in his own urine.  Defendants Pull and Samulak refused to help Plaintiff get up off the floor and instead told him that he could either get up on his own or remain on the floor.  Defendants Pull and Samulak departed and did not check on Plaintiff again that night.  Unable to get up on his own, Plaintiff remained on the floor all night.

With respect to the objective prong of the Eighth Amendment analysis, contemporary standards of decency determine whether conditions of confinement are cruel and unusual.  *See Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities."  *Hadix*, 367 F.3d at 525 (quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)).  Again, if this objective standard is satisfied, the Court must then determine whether Defendants acted with a "sufficiently culpable state of mind."  *Farmer*, 511 U.S. at 834.  In other words, were Defendants deliberately indifferent to Plaintiff's health or safety.  *Id.*

Defendants assert that they are entitled to summary judgment as to this claim because Plaintiff's claim that he fell attempting to climb into the upper bunk is "implausible."  Defendants have failed to submit evidence demonstrating that it is implausible that Plaintiff (or a person with Plaintiff's medical conditions) might fall while attempting to climb into an upper bunk.  The Court further notes that Plaintiff asserts in his verified amended complaint that he did, in fact, fall to the ground while attempting to climb into an upper bunk and Defendants have submitted no evidence to the contrary.

Defendants also assert that they are entitled to relief because "there is no medical proof that a fall occurred and no injury sustained by Plaintiff."  Whether there exists *medical* proof that Plaintiff fell may be relevant, it is hardly dispositive.  Plaintiff asserts that he fell to the ground and Defendants have submitted no evidence to the contrary.  As for whether Plaintiff sustained an injury when he allegedly fell, such may be relevant if Plaintiff was asserting that Defendants unreasonably denied him medical treatment or if he was alleging that he was unable to get up off the floor *because of* injuries suffered when he fell.  Plaintiff asserts, however, that he fell because of injuries and/or impairments he was experiencing at the time he attempted to climb into the upper bunk.  The essence of Plaintiff's claim is that Defendants, by simply leaving him to lay in urine overnight, subjected him to conditions that deprived him of the "minimal civilized measure of life's necessities."  As to these allegations, Defendants Pull and Samulak simply counter that they "did not observe Plaintiff lying in his own urine and requesting medical treatment."  Such assertions simply highlight the existence of factual disputes which preclude summary judgment.

In sum, the evidence thus far submitted, interpreted in a light most favorable to Plaintiff, indicates that Plaintiff fell to the ground and was unable to arise on his own.  When Plaintiff asked Defendants for assistance, they took no action leaving Plaintiff to lay in urine overnight.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment be denied as to this particular claim.

B.      Qualified Immunity

The existence of unresolved factual issues preclude granting Defendants' motion for summary judgment.  Moreover, a reasonable prison official would have understood that Defendants'

alleged actions violated the Eighth Amendment. The undersigned, therefore, recommends that Defendants Pull and Samulak are not entitled to qualified immunity.


        C.      Eleventh Amendment Immunity

        Plaintiff is suing Defendants Pull and Samulak in their personal and official capacity seeking declaratory, injunctive, and monetary relief. For the same reasons articulated above, the undersigned recommends that Plaintiff's claims for monetary damages asserted against Defendant Pull and Defendant Samulak in their official capacity be dismissed.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that Defendants' Motion for Summary Judgment, (dkt. #30), be **granted in part and denied in part**; and Defendant Gardon's Motion for Summary Judgment, (dkt. #61), be **granted in part and denied in part**. Specifically, the undersigned recommends that Plaintiff's claims for monetary relief asserted against Defendants Gardon, Pull, and Samulak in their official capacity be dismissed pursuant to the Eleventh Amendment. The undersigned recommends that Defendants' motions for summary judgment otherwise be denied.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,


Date: December 29, 2011                    /s/ Ellen S. Carmody
                                            ELLEN S. CARMODY
                                            United States Magistrate Judge

-28-