UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HENRY McMURRY,

        Plaintiff,                                   Hon. Gordon J. Quist

v.                                                   Case No. 1:10 CV 1206

PATRICIA CARUSO, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>Defendants' Motion for Summary Judgment</u>. (Dkt. #96). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted**.

## BACKGROUND

Plaintiff John Henry McMurry presently is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Ryan Correctional Facility (RRF). The actions about which he complains, however, occurred between December 2006 and December 2010 at the Bellamy Creek Correctional Facility (IBC), the Riverside Correctional Facility (RCF), the Muskegon Correctional Facility (MCF), the G. Robert Cotton Correctional Facility (JCF), the Earnest C. Brooks Correctional Facility (LRF) and Lakeland Correctional Facility (LCF). Plaintiff sues the following Defendants: MDOC Director Patricia Caruso; JCF Doctors Vernon Stevenson, Savi Thri Kakani, Zivti Cohen, and Mehdi Almasi, Health Unit Manager Beth Gardon, Dietician Mary J. Eicher, and Resident Unit Officers

(unknown) Pull, (unknown) Baker, and (unknown) Samulak; LCF Doctors Bhamini Sudhir, Richard Hirschler and Syed Sohail, Dietician Patricia Willard and Assistant Food Service Director Debbie Lawrence; MCF Nurses Mike Whalen and Mary Hubbell; and Prison Healthcare Services, Inc. (PHS).

Plaintiff's amended complaint consists of sweeping allegations that Defendants conspired over a period of nearly four years to deny him adequate medical care for his various medical conditions. Plaintiff sets forth seven purported causes of action, in which he broadly alleges that Defendants' conduct violated the Eighth Amendment and the Americans with Disabilities Act (ADA), as well as state statutes, MDOC policies and procedures, and the state's contractual agreement with PHS. Plaintiff seeks declaratory relief, monetary damages, and injunctive relief in the form of specific medical treatment. While Plaintiff's amended complaint contains no specific factual allegations, he has submitted with his amended complaint a "Sworn Statement of the Factual Basis of the Complaint" in which Plaintiff makes the following allegations. (Dkt. #13, Exhibit 2).

Plaintiff had reconstructive right-knee surgery on June 30, 2006, while in the custody of the MDOC at Macomb Correctional Facility. He was placed in a cast until August 24, 2006, and after the cast was removed, he could not bend his knee at all. He received physical therapy from October to December 2006, which improved his knee flexion to sixty percent. On December 7, 2006, Plaintiff's physician recommended that he: (1) use an exercise bike daily; (2) take Motrin; (3) have a lower-bunk assignment; and (4) be given soft-toe shoes with arch support.

On December 18, 2006, Plaintiff was transferred to IBC, which had no exercise bike. Plaintiff met with Nurse Valorie K. Hammond, who told Plaintiff that the facility was not required to honor his doctor's recommendations. Plaintiff asked for a transfer to a facility that could meet his rehabilitation and accommodation needs. Although Hammond declined to recommend the transfer,

Plaintiff was transferred to RCF on January 11, 2007. Plaintiff had no access to an exercise bike at RCF, but he was given a bottom-bunk assignment.

Plaintiff was transferred to MCF on March 14, 2007. At MCF, he was assigned to a top bunk. Plaintiff told Nurse Todd Hix that he could not climb to the top bunk. Hix told Plaintiff that he could not make a bottom-bunk assignment and that Plaintiff needed to kite Defendant Mike Whalen about the issue. Plaintiff immediately completed an emergency request to Whalen and slept in his chair that night. The following day, Plaintiff was required by staff to climb into his bunk during prisoner count, upon penalty of receiving a misconduct ticket. Plaintiff attempted to climb to the top bunk, which had no ladder. Plaintiff climbed a chair and attempted to step onto the desk, but his knee did not bend, causing him to fall. Plaintiff reported the fall to custody staff, who again told him to kite healthcare. The following day, March 16, 2007, Plaintiff addressed a kite to Defendant Whalen and Doctor Jason Kim. Defendant Whalen responded on March 28, 2007, though Plaintiff did not receive the response until April 15, 2007. In the interim, Plaintiff also complained to Warden Shirlee Harry and Todd Hix, both of whom told him to address his concerns to Defendant Whalen. Whalen determined that Plaintiff's complaints were not urgent.

On four occasions between April 17, 2007, and May 7, 2007, Plaintiff sent additional kites to Defendant Whalen and Dr. Kim complaining about pain and his need for soft-toed shoes. On April 24, 2007, Plaintiff sent a similar kite to Defendant Mary Hubbell who responded that soft-toed shoes were not approved by the Regional Medical Officer.

On May 11, 2007, Plaintiff was examined by Nurse Clarice Kanouse who issued Plaintiff a temporary bottom-bunk detail valid until June 11, 2007. Over the course of the next three months, Plaintiff sent Defendant Whalen numerous complaints of lower back, hip and shoulder pain. Plaintiff

was eventually scheduled to visit with a doctor in August. Plaintiff's temporary bottom-bunk detail was later extended, but he was nonetheless moved to a cell on the second floor. On September 11, 2007, Plaintiff was examined by Dr. Suzanne Hawkins who ordered that Plaintiff be sent to Brooks Correctional Facility for an x-ray. Dr. Hawkins again examined Plaintiff on September 28, 2007, but the previously ordered x-rays were not available. The doctor also requested that Plaintiff participate in an MRI examination. Dr. Hawkins told Plaintiff that another follow-up examination would be scheduled, but no such examination ever occurred.

Plaintiff filed numerous additional grievances about his back, hip and knee pain between October 10, 2007 and February 18, 2008. He also sent complaints about pain, unexpected bladder and bowel incontinence, and his various medications between March and May 2008. On May 27, 2008, Plaintiff complained to health care that he was experiencing burning in the back of his throat, that swallowing food was painful, and that he was also suffering wheezing and shortness of breath. Plaintiff was examined on June 23, 2008, by Physician's Assistant Daniel Spitters and Nurse Rosa Rodriguez. Spitters diagnosed GERD-reflux, for which he prescribed Gaviscon and Zantac. Spitters, however, refused to address Plaintiff's back complaints.

Between July and October 2008, Plaintiff filed various healthcare requests concerning his pain and incontinence. He was examined by Dr. Thornton on October 7, 2008, but the doctor refused to address anything other than Plaintiff's asthma. On October 20, 2008, and November 5, 2008, Plaintiff filed additional kites about his pain and his bowel and bladder control issues. Plaintiff was examined by Nurse Rodriguez on December 9, 2008, who referred Plaintiff to a doctor. Plaintiff did not receive a medical call-out within three weeks, however, at which point Plaintiff filed another kite. On January 5, 2009, Plaintiff was examined by Dr. Ronald Graeser who determined that an MRI was necessary.

On February 2, 2009, Plaintiff participated in an MRI examination, the results of which revealed that he had a herniated disc. Plaintiff was then scheduled for an evaluation with a neurosurgeon. On February 6, 2009, Plaintiff sent a kite complaining about pain and lack of bladder control. He received a response on March 3, 2009, advising him to take Naproxen and hot showers for his pain. On March 20, 2009, Plaintiff was transported to Duane Waters Hospital for a consultation with neurosurgeon Dr. Harish Rawal. Plaintiff alleges that no medical records were sent with him, so Dr. Rawal was unable to review the MRI necessary to conduct a complete evaluation. Plaintiff alleges that the failure to send medical records was an act of retaliation by unnamed Defendants.

Following his consultation with Dr. Rawal, Plaintiff submitted multiple kites about pain between March 24, 2009, and April 1, 2009. Plaintiff was subsequently examined by a physician's assistant, at which point he asserted that Naproxen was not helping his back, hip or shoulder pain. No new medication was prescribed, however. Plaintiff again kited health services on April 23, 2009, describing his pain and his need for a lower bunk. Plaintiff was informed that his chart was sent to the medical service provider for review. Plaintiff sent a kite to Whalen and Hubbell on April 25, 2009, complaining about his lack of bladder control. On April 27, 2009, Nurse Kanouse responded to the kite, informing Plaintiff that his chart would be given to a physician's assistant. On May 6, 2009, Plaintiff again requested a bottom-bunk detail and sought referral to the pain management team because of his unbearable pain and daily loss of bladder control.

On May 14, 2009, Plaintiff was transferred to JCF so that he would have access to Duane Waters Hospital for the physical therapy recommended by Dr. Rawal. At the time of his transfer, Plaintiff had an accommodation for a ground floor cell and a lower bunk. Nevertheless, Plaintiff was placed on the upper floor and harassed by custody staff about his accommodations. Plaintiff was later

informed that the accommodation he sought required the approval of Defendant Gardon. On May 18, 2009, Plaintiff submitted a kite to Defendant Gardon concerning his request for an accommodation. Gardon did not respond to Plaintiff's kite. On May 24, 2009, Plaintiff submitted another kite to Gardon concerning his request for an accommodation. Defendant Gardon again failed to respond to Plaintiff's kite. Plaintiff also spoke with Resident Unit Advisor O'Dell, showing him his cell and bunk accommodations. O'Dell said he would contact Assistant Deputy Warden Larry Ford to approve the move. The move was approved and Plaintiff was moved to a bottom bunk in a ground-floor cell.

On June 3, 2009, Plaintiff was moved to the top bunk of an upstairs cell, "under threat, intimidation, [and] duress by custody staff." When Plaintiff objected to the move, Defendant Pull told Plaintiff that if he did not comply he would be sent to segregation. Plaintiff told Pull that the move violated MDOC policy directives. Plaintiff showed his accommodations to Defendants Pull, Kisor and Samulak, who responded that such were not valid at JCF. In order to avoid a misconduct ticket, Plaintiff attempted to climb into his bunk. Plaintiff's back and knee gave out and he fell to the floor. He was lying on the floor in his own urine and asked his cell-mate to call for medical treatment. Defendants Pull, Baker, Samulak and Kisor believed Plaintiff was faking an injury in order to get a bottom bunk. Plaintiff told Defendants that he could not get up, and they indicated that he could either get up or sleep on the floor. Defendants departed and did not check on Plaintiff again that night. Plaintiff remained on the floor all night. The following morning, Plaintiff asked his cell-mate to help him up after which he asked prison staff to contact health care. Plaintiff was instructed to send a kite. On June 4, 2009, Plaintiff sent a kite explaining his fall and the refusal of staff to call for medical treatment.

On June 12, 2009, Plaintiff was examined by a physical therapist. Between June 4, 2009, and July 28, 2009, Plaintiff sent several kites complaining about his reflux symptoms and breathing

problems. He received an unspecified response on July 10, 2009, and was examined by Defendant Physician's Assistant Savi Thri Kakani on July 17, 2009. Plaintiff requested new pain medication, described his GERD problems, reported his fall, and described blood in his urine and urinary and bowel incontinence. Kakani refused to authorize additional treatment or a special diet, indicating that Plaintiff looked healthy to her. Plaintiff met with Defendant JCF Dietician Eicher on August 4, 2009. Eicher reported that Plaintiff was overweight at 237 pounds and had gained 30 pounds since his back injury. Plaintiff alleges that Eicher's data entries were knowingly false, in violation of both state and federal law. Plaintiff met with Nurse Mary Wilson on August 5, 2009, concerning his complaints of incontinence and back pain, but Wilson did not examine Plaintiff.

On August 21, 2009, Plaintiff was examined by Dr. Vernon Stephenson. Plaintiff gave Stephenson a document entitled "Legal Constructive Notice," setting forth his claims of GERD, unexpected urination, blood in his stool, burning in the back of his throat, chest/abdominal pain, vomiting, dizziness, wheezing, and shortness of breath. Stephenson prescribed an anti-depressant medication for pain and canceled the request for physical therapy because Plaintiff had issues of unexpected urination. Plaintiff's symptoms subsequently worsened and he submitted additional medical kites on numerous occasions between August 24, 2009, and October 12, 2009. When Plaintiff was examined by Defendant Dr. Zivit Cohen on October 21, 2009, he gave the doctor a "Legal Constructive Notice" regarding his symptoms. Dr. Cohen refused additional treatment for Plaintiff's GERD and refused to prescribe a special diet for Plaintiff.

Plaintiff submitted another kite on November 10, 2009, complaining about his various ailments. On November 13, 2009, Plaintiff met with Nurse Frances Hinsley, who was unable to answer questions about his problems. Plaintiff was told by Mary Wilson that Health Unit Manager Gardon

refused to approve his request for a bottom bunk because he was young enough to climb into an upper bunk. Plaintiff kited Gardon on December 6, 2009, but she never responded.

On December 8, 2009, Plaintiff met with Defendant Dr. Mehdi Almasi about the blood in his urine, incontinence, GERD and pain. Plaintiff also provided Dr. Almasi with a "Legal Constructive Notice." Almasi prescribed ten days of pain medication and also advised Plaintiff that he did not have the results of an ultrasound test Plaintiff had been given. On December 23, 2009, Plaintiff complained to Dr. Tomsen that he was unstable because he was being laughed at and was humiliated about his incontinence issues. That same day, Plaintiff met with Dr. Almasi, who advised Plaintiff that the results of his ultrasound test were normal.

Plaintiff complained again on December 29, 2009 and January 11, 2010, adding to his list of problems swelling in his right knee and numbness in his right hand and toes. On February 4, 2010, Plaintiff was taken to the hospital for diagnostic testing in the form of an intravenous pyelogram of his bladder and kidneys due to his complaints of blood in the urine, painful urination, vomiting, nausea and hypertension. On February 24, 2010, Dr. Cohen met with Plaintiff regarding his complaints of blood in his urine, hypertension and chronic back pain. Plaintiff told the doctor that Tylenol was not helping with his pain. Sometime thereafter, Plaintiff was called to health services to provide a supervised urine specimen the results of which were totally clear. According to Plaintiff, his urine sample was clear because he had consumed a large quantity of water that morning. On January 28, 2010, Dr. Cohen issued Plaintiff a reflux-diet accommodation which was scheduled to continue until July 29, 2010.[1]

---

[1] Although Plaintiff states that Dr. Cohen issued the accommodation on January 28, 2009, this appears to be a typographical error, as Plaintiff was not housed at JCF or treated by Defendant Cohen in January 2009.

On March 11, 2010, Plaintiff was transferred to the Carson City Correctional Facility (DRF) supposedly in retaliation for his many complaints. Plaintiff's still-valid reflux diet detail could not be accommodated at DRF. Plaintiff was examined by Physician's Assistant George about his GERD. When presented with Plaintiff's "Legal Constructive Notice," George refused to address any other health issue. Plaintiff was transferred to the Lakeland Correctional Facility (LCF) on May 26, 2010.

On June 28, 2010, Defendant Dr. Bhamini Sudhir examined Plaintiff regarding his complaints of blood in his urine, burning while urinating, incontinence, his need for incontinence pads, his need for pain medication, and his request for physical therapy. Dr. Sudhir refused to treat Plaintiff, telling him that the state was broke and that Plaintiff needed to purchase over-the-counter medication. The doctor also told Plaintiff that his reflux diet was being discontinued because the new standard menu would meet his needs. While the doctor agreed that certain food items caused Plaintiff problems, she told Plaintiff that suffering was good because it built character. Dr. Sudhir did, however, submit a request for physical therapy. Dr. Hirschler was present during this particular appointment.

On July 20, 2010, Plaintiff met with Dr. Hirschler and presented him with another "Legal Constructive Notice." Dr. Hirschler told Plaintiff that his condition was not life threatening and that the company (PHS) was in place to save the State of Michigan money. On June 28, 2010, Plaintiff met with Dr. Syed M. Sohail to whom he also provided a "Legal Constructive Notice." Dr. Sohail told Plaintiff that PHS had denied the request for physical therapy. The doctor instead provided Plaintiff a sheet containing exercises that he could complete on his own. Dr. Sohail denied Plaintiff's request for additional pain medications and instead told him to buy over-the-counter medications. Dr. Sohail also denied Plaintiff treatment for any other problem.

On August 17, 2010, Plaintiff received an answer from Dr. Sohail concerning one of the assertions in the "Legal Constructive Notice." The doctor further instructed Plaintiff to submit a kite to obtain an appointment to address additional issues. Plaintiff submitted multiple kites and on October 20, 2010, he was called out to health care. Plaintiff met with Nurse Practitioner Raymond Ingraham to whom he presented a "Legal Constructive Notice." Plaintiff alleges that Ingraham was rude and refused to address the issues in the Notice.

Plaintiff kited Defendant Dietician Patricia Willard on July 7, 2010. Plaintiff complained that his diet was "not accurate" and that he was being served foods which "hurt" him. On July 13, 2010, Plaintiff was served beef stew from the main food menu. The stew contained tomatoes, which caused Plaintiff to experience reflux problems. Plaintiff showed the stew to Food Service Supervisor E. Smith who told Plaintiff to kite Defendant Willard. Soon thereafter, Plaintiff was again served beef stew which caused him to vomit on his tray. Plaintiff took his tray to Defendant Debbie Lawrence, who told him that Willard had authorized the stew to be served to Plaintiff. According to Plaintiff, Defendants Willard and Lawrence conspired to cause Plaintiff pain. On July 25, 2010, Willard recommended that Plaintiff's diet detail be renewed for three months, until October 28, 2010.

On October 21, 2010, Plaintiff was transferred to the Earnest C. Brooks Correctional Facility (LRF) in order to participate in the Legal Writing Program. At intake, Nurse Holly Smyth supplied Plaintiff with his reflux-diet detail. Plaintiff showed his detail to the food services staff who made a copy thereof. After receiving his special diet the following day, Plaintiff was informed by a cook that he had been instructed by Assistant Food Service Director Daniels to no longer serve Plaintiff a special diet because Plaintiff's diet detail was invalid. Plaintiff was denied his special diet between October 24, 2010 and December 16, 2010. In response to Plaintiff's kites, Dietician Barbara Anderson

told Plaintiff that his diet detail had expired and would not be renewed because he could eat from the regular menu. Plaintiff alleges that Defendant Dieticians Eicher and Willard fail to satisfy the qualifications for dietician articulated by Michigan law.

On March 23, 2011, the Honorable Gordon J. Quist issued an Opinion and Order dismissing the majority of Plaintiff's claims. (Dkt. #16-17). Specifically, Judge Quist dismissed all of Plaintiff's claims save his Eighth Amendment claims against Defendants Stevenson, Kakani, Pull, Baker, Samulak, Cohen, Almasi, Sudhir, Hirschler, Sohail, Whalen, Gardon, and Prison Health Services. Plaintiff's official capacity claims against Defendants Pull, Samulak, and Gardon were also subsequently dismissed. (Dkt. #81, 86). Defendants Almasi, Sohail, Hirschler, Kakani, and Prison Health Services now move for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th

Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

**I.       Defendant Almasi**

As noted above, Plaintiff was examined by Dr. Almasi on December 8, 2009, concerning his complaints of blood in his urine, incontinence, GERD and pain. The doctor informed Plaintiff that the results of a recent ultrasound examination were not available. The doctor did, however, prescribe pain medication to Plaintiff. On December 23, 2009, Dr. Almasi informed Plaintiff that the results of

his ultrasound test were normal. Plaintiff asserts that Dr. Almasi's actions violated his Eighth Amendment right to be free from cruel and unusual punishment.

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001). The analysis by which a defendant's conduct is evaluated consists of two-steps. First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need," sufficient to implicate the Eighth Amendment, is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). If the objective test is met, the Court must then determine whether the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to

take reasonable measures to abate it." *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847).

To the extent, however, that the plaintiff simply disagrees with the treatment he received, or asserts that he received negligent care, the defendant is entitled to summary judgment. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) (to prevail on an Eighth Amendment denial of medical treatment claim, "the inmate must show more than negligence or the misdiagnosis of an ailment"); *Robbins v. Black*, 351 Fed. Appx. 58, 62 (6th Cir., Nov. 3, 2009) ("mere negligence or malpractice is insufficient to establish an Eighth Amendment violation").

In support of his motion for summary judgment, Defendant Almasi has submitted an affidavit detailing his treatment of Plaintiff. (Dkt. #97, Exhibit D). The doctor examined Plaintiff on December 8, 2009, at which point he ordered a urine test and updated Plaintiff's special accommodations, including the approval for Plaintiff to sleep in a bottom bunk. The doctor also requested approval to prescribe Ultram to treat Plaintiff's pain. Defendant Almasi again examined Plaintiff again on December 23, 2009, at which point the doctor informed Plaintiff that the results of his recent ultrasound examination were "normal." The doctor also re-ordered medication to treat Plaintiff's hypertension. *Id.* The assertions in Dr. Almasi's affidavit are consistent with the evidence contained in Plaintiff's medical records. (Dkt. #99 at 68-69, 73 of 129). Plaintiff has submitted no evidence to the contrary.

This evidence reveals that Plaintiff was examined and treated by Dr. Almasi. Plaintiff is simply dissatisfied with the treatment he received. As previously noted, however, claims of negligence, medical malpractice, or mere dissatisfaction with treatment do not implicate the Eighth Amendment. Accordingly, the undersigned recommends that Defendant Almasi's motion for summary judgment be granted.

**II.         Defendant Sohail**

Plaintiff alleges that he was examined by Dr. Sohail on June 28, 2010. The doctor informed Plaintiff that his request to participate in physical therapy had been denied. Dr. Sohail instead provided Plaintiff a sheet containing exercises that he could complete on his own. The doctor denied Plaintiff's request for additional pain medications and also denied Plaintiff treatment for any other problem. Plaintiff asserts that Dr. Sohail's actions violated his Eighth Amendment right to be free from cruel and unusual punishment.

In support of his motion for summary judgment, Dr. Sohail has submitted an affidavit detailing his treatment of Plaintiff. (Dkt. #97, Exhibit E). The doctor concedes that he examined Plaintiff on a single occasion in response to allegations that Plaintiff was experiencing low back pain.[2] Dr. Sohail did not prescribe pain medication or refer Plaintiff to a specialist because Plaintiff's "back pain was responding well to exercise." The doctor concluded that, in his "medical judgment, no further treatment was required for GERD, hematuria, or the back pain." *Id.* Plaintiff has submitted no evidence to the contrary.

---

[2] In his affidavit, the doctor asserts that he examined Plaintiff on June 23, 2010, but the medical records, as well as Plaintiff's response, indicate that the encounter in question occurred on July 28, 2010. (Dkt. #99 at 117-18 of 129).

The evidence reveals that Dr. Sohail examined Plaintiff and exercised his medical judgment in determining the most appropriate method of treatment. Plaintiff is simply dissatisfied with the treatment he received. Again, claims of negligence, medical malpractice, or mere dissatisfaction with treatment do not implicate the Eighth Amendment. Accordingly, the undersigned recommends that Defendant Sohail's motion for summary judgment be granted.

**III.     Defendant Hirschler**

Plaintiff alleges that he was examined by Dr. Hirschler on July 20, 2010. When Plaintiff requested treatment for his various ailments, the doctor refused, informing Plaintiff that his condition was not life threatening and that he could simply purchase over-the-counter medication from the prison store. Plaintiff asserts that Dr. Hirschler's actions violated his Eighth Amendment right to be free from cruel and unusual punishment.

In support of his motion for summary judgment, Dr. Hirschler has submitted an affidavit describing his treatment of Plaintiff. (Dkt. #96, Exhibit A). In his affidavit, the doctor describes in great detail the treatment Plaintiff received for his various ailments during 2009 and 2010. According to Dr. Hirschler, an "alternative treatment plan" was developed in July 2010, to treat Plaintiff's various impairments. Plaintiff was examined by Dr. Hirschler on July 20, 2010, as part of this alternative treatment plan. Plaintiff reported that he had been performing his prescribed exercises and "was doing well the exercises." Plaintiff also reported that he was not taking his pain medication and "did not need any other pain medications at that time." The doctor reported that Plaintiff's hypertension "was well controlled" and that his GERD was "mostly controlled" with medication. *Id.* The doctor's contemporaneous treatment notes confirm the assertions in his affidavit and, furthermore, reveal that

Plaintiff's hematuria had apparently resolved. (Dkt. #99 at 112-14, 116 of 129). Plaintiff offers no evidence to the contrary.

The evidence reveals that Dr. Hirschler examined Plaintiff and exercised his medical judgment in determining the most appropriate method of treatment. Plaintiff is simply dissatisfied with the treatment he received. Again, claims of negligence, medical malpractice, or mere dissatisfaction with treatment do not implicate the Eighth Amendment. Accordingly, the undersigned recommends that Defendant Hirschler's motion for summary judgment be granted.

**IV.     Defendant Kakani**

Plaintiff alleges that he was examined by Physician's Assistant Kakani on July 17, 2009. Plaintiff requested treatment for his various ailments, but Kakani refused to authorize additional treatment or a special diet, indicating that Plaintiff looked healthy to her. Plaintiff asserts that Kakani's actions violated his Eighth Amendment right to be free from cruel and unusual punishment.

In support of her motion for summary judgment, Kakani has submitted an affidavit describing her encounter with Plaintiff. (Dkt. #96, Exhibit B). Kakani examined Plaintiff on July 17, 2009. Noting Plaintiff's "elevated" blood pressure, Kakani ordered that Plaintiff's blood pressure be checked four times weekly. Kakani modified Plaintiff's medication regimen and scheduled additional laboratory testing. Kakani also approved additional special accommodations for Plaintiff, including a knee brace and ground floor room. *Id.* These assertions are confirmed by Kakani's contemporaneous treatment notes. (Dkt. #99 at 30-35 of 129). Plaintiff has submitted no evidence to the contrary.

Again, the evidence reveals that Physician's Assistant Kakani examined Plaintiff and exercised her medical judgment in determining the most appropriate method of treatment. Plaintiff is

simply dissatisfied with the treatment he received. Again, claims of negligence, medical malpractice, or mere dissatisfaction with treatment do not implicate the Eighth Amendment. Accordingly, the undersigned recommends that Defendant Kakani's motion for summary judgment be granted.

V.        **Defendant Prison Health Services**

In his amended complaint, Plaintiff alleges that Defendant Prison Health Services denied him appropriate health care in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Prison Health Services argues that it is entitled to relief because Plaintiff has failed to establish that he suffered a violation of his rights as a result of any PHS policy, practice, or custom.

It is well accepted that Prison Health Services is not vicariously liable for the actions of its employees and, therefore, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). To establish liability against Prison Health Services, Plaintiff must demonstrate that he suffered a violation of his federal rights "because of" a Prison Health Services policy, practice, or custom. *See Thomas*, 398 F.3d at 429.

To establish the existence of a policy, practice, or custom, Plaintiff must demonstrate the following: (1) the existence of a "clear and persistent pattern" of illegal activity; (2) that Prison Health Services had notice or constructive notice of such; (3) that Prison Health Services tacitly approved of the illegal activity, such that "their deliberate indifference in their failure to act can be said to amount to an official policy of inaction" and (4) that the policy, practice, or custom in question was the "moving force" or "direct causal link" in the constitutional deprivation. *Id.* at 429 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

      Plaintiff has presented no evidence which, even if believed, would enable him to prevail on this claim. The undersigned, therefore, recommends that Defendant Prison Health Services' motion for summary judgment be granted.

## CONCLUSION

      For the reasons articulated herein, the undersigned recommends that <u>Defendants' Motion for Summary Judgment</u>, (dkt. #96), be **granted**. The undersigned further recommends that appeal of this matter would not be taken in good faith. *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. § 1915(a)(3).

      OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

      Respectfully submitted,

Date:  October 10, 2012                  /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge